William **ROELANDT** o/b/o William J. **ROELANDT,** Plaintiff,

v.

Kenneth S. **APFEL,** Commissioner of Social Security, Defendant.

No. 3–00–CV–90033.

United States District Court, S.D. Iowa, Davenport Division.

Jan. 9, 2001.

---

John A. Bowman, Bowman & Depree, Davenport, IA, for Plaintiff.

William C. Purdy, United States Attorney, Des Moines, IA, for Defendant.

## ORDER

PRATT, District Judge.

Plaintiff, William Roelandt, on behalf of his son William J. Roelandt, filed a Complaint in this Court on March 9, 2000, seeking review of the Commissioner's decision to deny his claim for Social Security benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is reversed.

## BACKGROUND

Plaintiff filed his application for benefits on June 16, 1996. Tr. at 83–86. After the application was denied initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. A hearing was held before Administrative Law Judge Andrew T. Palestini (ALJ) on March 17, 1998. Tr. at 45–66. The ALJ issued a Notice of Decision—Unfavorable August 10, 1998. Tr. at 11–27. The ALJ's decision was affirmed by the Appeals Council of the Social Security Administration on January 6, 2000. Tr. at 4–6. Plaintiff filed his Complaint in this Court on March 9, 2000.

## EVIDENCE BEFORE THE ALJ

Plaintiff's[1] treating physician is Barry S. Barudin, M.D. whose practice is limited to pediatrics (Tr. at 235). Tr. at 231–38. In a letter dated September 26, 1994, to Mrs. Gray of Hoover School in Davenport, Iowa, Dr. Barudin wrote that after an examination which revealed findings consistent with AD/HD[2], and a conversation

---

1. Here and throughout the remainder of the decision, the word "Plaintiff" refers to the child, William Roelandt, Jr.

2. Attention deficit hyperactivity disorder. Neil M. Davis *Medical Abbreviations* Eighth Edition.

with the school nurse and Plaintiff's father, the doctor wrote a prescription for Ritalin. Tr. at 235.

On August 19, 1996, psychiatrist Cynthia E. Hoover, M.D., wrote a report regarding Plaintiff's treatment at Vera French Community Mental Health Center between 1995 and the date of the report. Plaintiff was seen for an intake evaluation on March 29, 1995, at which time he was eight years old. It was noted that Plaintiff's mother was drug dependent and living on the streets. Plaintiff told Dr. Hoover that he was worried about his mother and about his inability to see her. Plaintiff's father described the child "as violent, and said he talked about killing himself. He went on to say that William had been fighting in school and was wetting the bed about three times a week. He was taking Ritalin SR, 20 mgs daily and Ritalin, 5 mgs at noon." Dr. Hoover wrote:

> I saw William for a psychiatric evaluation on March 29, 1995. I noted that he was on Ritalin prescribed by his family physician. It seemed his mother was drug dependent and living on the streets. He'd been switched from one elementary school to another because his behavior was out of control, and no major behavior problems were noted subsequent to the change. It seemed his behavior deteriorated markedly when he didn't take his Ritalin. Otherwise, he was noted to be compliant, calm, and conscientious. Diagnoses were:
>
> 1. Adjustment disorder with mixed disturbance of emotions and conduct;
> 2. Attention deficit hyperactivity disorder, controlled;
> 3. Fetal alcohol exposure.

Tr. at 239. On April 11, 1995, Dr. Barudin prescribed an extra 5 mg of Ritalin, "in the PM", at the advice of Dr. Hoover. Tr. at 233. On October 9, 1995, Dr. Barudin described Plaintiff as "a cooperative young man who is doing extremely well on his current dose of Ritalin." Tr. at 232.

A Mississippi Bend Area Education Agency Multidisciplinary Team Evaluation Comprehensive Assessment Summary dated March 20, 1996, when Plaintiff was in the fourth grade and was nine years and three months old, shows that on the Wechsler Intelligence Scale for Children–III Plaintiff scored a verbal IQ of 97, a performance IQ of 112, and a full scale IQ of 104. Tr. at 116. *See also* Tr. at 226–28. Because Plaintiff's teacher reported that Plaintiff was having difficulty completing reading and written assignments, Plaintiff was administered the Woodcock Johnson Achievement Test Revised, the Test of Written Language, and Curriculum Based Assessments to evaluate his skills. In the area of written language, Plaintiff demonstrated difficulty expressing his thoughts in a written format. His sentence structure was very simple and he made numerous spelling errors. Tr. at 117. In the area of reading, Plaintiff was below grade level. While an average student of Plaintiff's grade level was reading approximately 100 correct words per minute, Plaintiff's was able to read 43 words per minute with seven errors. Tr. at 118. Plaintiff's math teacher reported that Plaintiff does a very nice job in math class and can complete assignments at grade level. Tr. 119.

On April 12, 1996, it was reported to Dr. Barudin that Plaintiff was having problems with his medication, especially in the afternoon, so an additional dosage was prescribed to be given at noon each day[3]. Tr. at 232.

Plaintiff was seen for a psychiatric Evaluation by Gretchen L. Cromer, M.D. on October 11, 1996, at the request of Disability Determination Services. It was reported to Dr. Cromer that during the previous school year, Plaintiff's father was called by the school 2 to 3 times per week because Plaintiff was verbally abusive to teachers

---

**3.** It is not clear from the record if the increased dosage on April 12, 1996 was in addition to the extra 5 mg prescribed on April 11, 1995, or if somewhere in between the afternoon dosage had been dropped.

and other students. Dr. Cromer wrote: "It is notable that after starting a stimulant medication, he was described as being a 'new person.' The father believes that the medication has been helpful for the most part, although there have been some periods where the medicine did not work." Tr. at 241. Describing his son on medication, Plaintiff's father said: "The majority of time he is close to normal," but added that there were days the medicine did not seem to work. Dr. Cromer wrote that Plaintiff's mother was hospitalized for a major depressive disorder and was "said to be drug dependent with the drug of choice being Crack as well as alcohol difficulties." Plaintiff's father said that he believed that his ex-wife had used alcohol during pregnancy. Tr. at 242. On mental status examination, there was mild fidgeting, particularly with his fingers and feet and there was no evidence of homicidal or suicidal ideation. Dr. Cromer's impression was: Adjustment reaction; attention deficit disorder; and, primary nocturnal enureasis. Tr. at 243.

Records from the Davenport Community School District dated April 22, 1997, indicate that a major area of difficulty is behavior due to attention deficit disorder. Plaintiff was using Ritalin but it was necessary for him to miss the majority of his first period classes because the medication did not take effect until then. Prior to the medication taking effect, Plaintiff was highly disruptive. Tr. at 103. During the hour and a half that it takes the medication to become effective, Plaintiff was unable to concentrate on his work and was either very silly or extremely easy to anger. It was the recommendation of the staff that Plaintiff begin his school day in a special education classroom while the medication takes effect. It was also recommended that he return to the special education classroom for a time after lunch. Tr. at 104.

The record contains several pages of Detention And Supervised Study Referral Forms from Wilson Elementary School between the dates September 12, 1996 and May 8, 1997. Tr. at 126–38. These forms document incidents wherein Plaintiff was disruptive and aggressive. Disciplinary reports beginning with September 12, 1997 begin on page 159 of the record. These records indicate that Plaintiff was becoming more aggressive and more difficult to handle. On September 15, 1997, Roger Keester wrote: "Can't be quiet—have talked to him today, also moved his seat, still interrupts during class—distracts other students—can't be quiet—told other student he would make a welt on his face." Tr. at 160. Other reports are dated 9/15/97 & 9/19/97 (can't be quiet, disturbing other students) (Tr. at 160), 9/19/97 (shoving another student after coming to class late) & 9/20/97 (refused to work and refused to report to detention room) (Tr. at 163), 9/26/97 (Running and pushing students when coming inside yelling his head off, would not listen to me or calm down) (Tr. at 165), 9/30/97 (I can't deal with it any longer—he is yelling, destroying his project, doing the opposite of everything I ask.) (Tr. at 166), 10/3/97 (He hit a student in a conflict at breakfast. Plus sent out of music for insubordination and disruption.) (Tr. at 167), 10/6/97 (fighting) (Tr. at 168), 11/25/97 (sexually harassed a girl in PE class.) (Tr. at 169), 12/2/97 (fighting) (Tr. at 171), 12/12/97 (could not gain control and "get on task and quit talking.") (Tr. at 170), 1/6/97 (refusing to follow directions and cannot control his behavior. Starting fights with other students.) (Tr. at 172), 1/9/98 (pushing girls), 1/13/98 (refusing to do work, threatening teacher and other students) (Tr. at 173), 2/3/98 (fighting and threatening staff), (Tr. at 174), 2/2/98 and 2/5/98 (fighting with another student. "This started when William walked to Greg's desk and threw Greg's folder on the floor.") (Tr. at 175). On April 29, 1998, Gina Miller wrote:

William was a complete disruption in study hall. I began talking to him about it. He walked out of the room and began making very serious threatening statements towards me. "Fucking bitch, I'm going to kill her, I'm going to stab her and her whole family, I'm going

to trash her van, I want her neck broken, her head broken, her legs broken. She deserves to be 6 feet under. I want her lungs to fill up so she can't breath." He also kicked over a chair and threw his books on the floor.

William is receiving a 5 day suspension for his actions. We, therefore, need to reevaluate William by doing a new IEP. When a student exceeds 10 days of being suspended in a year, a new IEP needs to be done.

Tr. at 189–90. On the same day another teacher wrote: "William was soooo bad. Wouldn't do work. I tried to give him a pencil he refused. He wouldn't stay seated, and he wouldn't stop talking. Whistling and everything. Put paper in recycle box and part of it on the floor. The more the kids laughed at him the worse he act. He tore my attendance up and then said oops." Tr. at 192. On March 26, Gina Miller wrote that the frequency of Plaintiff's disruptions had greatly increased and that "William is making my room nonfunctional. He is a constant disruption!" Ms. Miller also wrote: "At this point, William's medication has not helped him in any way during school hours." Tr. at 195. On May 7, 1998, when Plaintiff returned to school after a suspension, he refused to give the teacher his pass to readmit him, walked out of the classroom and spent 1½ hours walking the school grounds and smearing clay on the teacher's car windows. On May 8, 1998, after Plaintiff could not control himself, his father was called to take him home for the afternoon. Tr. at 205. A report dated May 15, 1998, states that Plaintiff's behavior had become worse. "The frequency of William's inappropriate behaviors has increased to the point that when he is in school, he occupies most, if not all, of my time." Tr. at 209.

Plaintiff was seen for a psychiatric evaluation by Daniel J. Huesgen, M.D. of Vera French Community Mental Health Center, on May 21, 1997. Tr. at 250–52. It was noted that Dr. Barudin was closing his practice and leaving the area. Plaintiff's dose of Ritalin was 5 mgs in the morning; 20 mgs of Ritalin SR at 8:30 a.m.; 10 mgs of Ritalin at 1:00 p.m., and 5 mgs of Ritalin at 4:00 p.m. With the increased dosage, "the symptoms stabilized; however, he became more irritable, perhaps depressed, and withdrawn. He was displaying more temper outbursts, and although he had not harmed anyone, the outbursts were escalating in severity and frequency." Plaintiff was still enuretic although no organic cause had been identified. It was noted that Plaintiff's mother had used drugs and alcohol throughout the pregnancy. Tr. at 250. Dr. Huesgen wrote:

During the examination, William presented as older than his stated age. He had several dysmorphic features, including narrow bifrontal diameter grossly, nail hypoplasia, narrow palpebral fissure, ptosis, thin upper lip, flat mid-face, smooth filtrum, short nose, and unruly scalp hair. He was able to sit still through much of the interview. Affect was irritable. Eye contact was poor. Mood was slightly depressed. His speech was of regular rate. Language was normal in comprehension and fluency. Intelligence appeared average. Attention and concentration were fair to good. No suicidal ideation, hallucinations, delusions, or paranoia were elicited.

Tr. at 250–51. In addition to ADHD and functional enuresis, Dr. Huesgen diagnosed oppositional defiant disorder and fetal alcohol syndrome as well as "reading disorder (per AEA report)". The sustained release Ritalin was discontinued and Ritalin, 15 mgs. three times per day was pre-scribed. Because it was reported that Plaintiff's father often forgot to give him the morning dose, it was recommended that the morning dose be given at school. When Plaintiff was seen for a follow up examination on June 11, 1997, Dexedrine was substituted for Ritalin because it was reported that the effects of Ritalin tended to "wear off" resulting in significant increases in Plaintiff's impulsivity and activity. On July 21, 1997, Plaintiff's father reported that the Dexedrine was ineffective and that the father had re-

started the Ritalin at the previous dose and that Plaintiff's had responded to the Ritalin and had been doing fine. Dr. Huesgen wrote:

> Regarding his functional abilities, William does not appear significantly limited in the areas of communicative, motor and social development and functioning. However, mild to moderate limitations are noted in the areas of personal/behavioral and cognitive development and functioning. Further moderate limitations are noted in the areas of concentration, persistence and pace.

Tr. at 251. Dr. Huesgen's clinical notes are in the record at pages 260 to 83. On April 27, 1998, the doctor wrote:

> As seen in the first evaluation, William has multiple disabilities. He has fetal alcohol syndrome, his mother used alcohol during pregnancy. He has all the clinical features. He has Attention Deficit Hyperactivity Disorder, Oppositional Defiant Disorder. His symptoms of HDHD are very severe and exacerbated by the fetal alcohol exposure. He also has a Reading Disorder, by the AEA report. Medication has been partially effective in alleviating symptoms, but not yet to a satisfactory degree.
>
> On mental status, he is fidgety and impulsive, active, cannot sit still. He is loud, rude, irritable. No tics, no abnormal movements. His affect is sullen. He denies depressed mood.

Tr. at 260.

## ADMINISTRATIVE HEARING

At the hearing of March 17, 1998, three witnesses testified. The witnesses were Gina Miller and Roger Keester, a teacher and associate principal, respectively, at Plaintiff's school, and Plaintiff's father. The essence of the testimony was that while Plaintiff is a likable child, because of his illness, he is unable to keep himself from talking to the point that he disturbs the normal functioning at his school. Both Mr. Keester and Plaintiff's father testified that Plaintiff's medication does not control his illness the way that they believe it should. Tr. at 54 (Keester: "... but the

meds are not working as well as they should. I think they need to be adjusted or changed or something.") and Tr. at 57 (Father: "But, he's on, I think, the highest dosage that he can take of the Ritalin for his age and his size.... I'm going to talk to [the doctor] and see if there's a different drug that we can try.")

## ADMINISTRATIVE DECISION

In his decision, dated August 10, 1998, the ALJ, stated that the adjudication of the case had been delayed because of a revision of the Regulations mandated by amendments to the Social Security Act enacted by Congress on August 22, 1996. Tr. at 14. Following the three step sequential evaluation prescribed for childhood disability claims, the ALJ first found that Plaintiff's has not engaged in substantial gainful activity during any period under adjudication. Tr. at 26. At the second step, the ALJ found that the severe impairments in this case are ADHD and an adjustment disorder. At the third step, the ALJ found that Plaintiff's impairments do not meet or equal a listed impairment, and that Plaintiff is, therefore, not disabled. The ALJ found that between the date of the application and September 24, 1997, Plaintiff did not have a "marked" or "extreme" limitation in any area of functioning. Between September 24, 1997 and the date of the decision, the ALJ found that Plaintiff had a "marked" limitation of functioning in the area of social development, but that he did not have a "marked" or "extreme" limitation of functioning in any other area. Tr. at 27. In finding that Plaintiff's social behavior has not risen to the "extreme" level, the ALJ wrote:

> The medical record indicates that some of the behavior problems have been caused by erratic taking of his prescribed medication. (Exhibits 3F, 4F, 5E, 6F, 7E, 10F) Either the claimant refuses to swallow the Ritalin (Exhibit 10F), the father forgets to give his child the morning dose of Ritalin (Exhibit 6F), or the claimant takes the Ritalin off

schedule (Exhibits 3E, 5E, 7E, and 10F), delaying the ameliorative affects of the Ritalin on the child's behavior. Tr. at 23–24. The ALJ found that Plaintiff was not disabled as defined in the Act, nor was he entitled to the benefits for which he had applied. Tr. at 27.

## EVIDENCE SUBMITTED TO THE APPEALS COUNCIL

A school report dated September 17,-1998, states that Plaintiff continued to struggle behaviorally and to be a disruption both in and out of the classroom. In class, Plaintiff needed to be told to stop talking two times every minute. Plaintiff had been suspended that school year for swinging a fist at a morning supervisor when asked to get in the back of the breakfast line. The author of the report wrote: "The frequency of Williams (sic) inappropriate behaviors has and continues to increase to the point that when he is in school, he occupies most, if not all of my time." It was noted that although Plaintiff's is capable of grade level work, it was difficult to achieve due to his impulsive and distractible behavior. Tr. at 298. The teacher noted that constant reminders to stay on task become ineffective and tend to increase Plaintiff's misbehavior. Tr. at 299. It was also noted that Plaintiff needs "more time given to complete a test due to his inability to stay on task for long periods of time." Tr. at 305. On a form entitled Functional Behavioral Assessment And Behavioral Intervention Plan Summary, it was written: "William displays extreme distractability as manifested by excessive talking, inability to sit still, listen to directions or stay on task.... These behaviors result in his inability to complete work or maintain behaviors necessary to stay in class." Tr. at 307.

On October 4, 1998, Plaintiff was admitted to Genesis Medical Center in Davenport, Iowa. Tr. at 285–96. Dr. Huesgen wrote that on the day of admission:

... evidently William had a severe anger outburst. Father also reported he was "paranoid" even more than previously. Father has used this term at baseline to describe his son. He was hanging sheets over the drapes and barricading the doors, destructive at home, kicking holes in the walls, and threatening to kill a younger brother. He tore apart father's breathing machine which father uses for his own asthma medication. He stated he was hanging up sheets because he was afraid of being kidnaped. Also he reported a fear of germs and that if someone were to sneeze or cough near him he would get their germs.

During the temper outburst his father restrained him for an hour and a half. During the time of restraint he would not calm down and therefore the police were contacted. During this outburst he pushed his father down. His father could not control him. He also talked about killing his brothers in their sleep with his father.

Tr. at 288. On mental status exam, Dr. Huesgen wrote:

He appears his stated age. He has dysmorphic features: narrow bifrontal diameter, narrow palpebral fissures, ptosis, thin upper lip, flat mid face, smooth filtrum, short nose, and unruly scalp hair. He is very active, fidgety, and impulsive. He cannot sit still. His eye contact is poor. His mood is described as "fine." His affect is irritable. His speech is increased in rate but not pressured. His intelligence appears average. His attention and concentration are fair. He denies outright hallucinations. Please see above regarding paranoia. No suicidal or homicidal ideations.

Tr. at 289. The doctor stated that Plaintiff's medication had been recently changed to dexedrine and Clonidine, and that consideration was being given to the possibility that the stimulant medication was causing paranoia. Tr. at 289–90. Apparently Plaintiff had been hospitalized on September 16, 1998 (Tr. at 291), although those records were not submitted. Dr. Huesgen stated that at the end of the previous hospitalization, Plaintiff did not

want to leave the hospital so consideration was also being given to the possibility that his behavior outburst was undertaken with the goal of readmission to the hospital, "however this is not readily apparent and it needs to be reviewed thoroughly prior to discharge because of the significant reasons for which he was admitted." Dr. Huesgen's multiaxil diagnosis was:

Axis I: Attention deficit hyperactivity disorder, combined. Enuresis. Oppositional defiant disorder.

Axis II: Reading disorder.

Axis III: Fetal alcohol syndrome.

Axis IV: Lack of maternal involvement, school problems, and poor peer relations.

Axis V. GAF score is 40.

Tr. at 290. An electroencephalographic study supported a diagnosis of a seizure disorder, but the report stated that clinical correlation was required. Tr. at 293.

The Appeals Council considered the additional evidence but concluded that the new evidence did not provide a basis for changing the ALJ's Decision.

## DISCUSSION

■ The scope of this Court's review is whether the decision of the Secretary in denying disability benefits is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). *See Lorenzen v. Chater*, 71 F.3d 316, 318 (8th Cir.1995). Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support the conclusion. *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir.1996). We must consider both evidence that supports the Secretary's decision and that which detracts from it, but the denial of benefits shall not be overturned merely because substantial evidence exists in the record to support a contrary decision. *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir.1996) (citations omitted). When evaluating contradictory evidence, if two inconsistent positions are possible and one represents the Secretary's findings, this Court must

affirm. *Orrick v. Sullivan*, 966 F.2d 368, 371 (8th Cir.1992) (citation omitted). *Fenton v. Apfel*, 149 F.3d 907, 910–11 (8th Cir.1998).

■ In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel*, 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger*, 522 F.2d 13, 16 (8th Cir. 1975).

The Personal Responsibility and Work Opportunity Act of 1996 became effective on August 22, 1996. See Pub.L. No. 104–193, 110 Stat. 2105 § 211(b)(2) (1996). This legislation defines childhood disability as follows:

An individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(C)(i).

20 C.F.R. § 416.924(a) sets out a three step sequential evaluation process for childhood disability claims. At the first step, it is determined whether or not the claimant is working. If the claimant is not working, severe impairments are identified at step two. At step three, the severe impairments are compared to the childhood listings in Appendix 1 of 20 C.F.R. Pt. 404, Subpt. P. If the impairment(s) meet or equal a listing, the child is disabled. If not, then the ALJ must find the child not disabled. In *Harper v. Apfel*, 2000 WL 1369507 at *3 (S.D.Ala.2000), the Court wrote: "The current standard is more stringent than that employed prior to the effective date of Pub.L. No. 104–193, given Congress' decision, as stated in the House conference report, to confine the definition of childhood disability to the first three steps of the sequential evaluation process." *Harper* then quotes from 142

Cong.Rec. H8829, 8913 (1996 WL 428614), H.R. Conf. Rep. No. 104–725 (July 30, 1996):

> The conferees intend that only needy children with severe disabilities be eligible for SSI, and the Listing of Impairments and other current disability determination regulations as modified by these provisions properly reflect the severity of disability contemplated by the new statutory definition.... The conferees are also aware that SSA uses the term "severe" to often mean "other than minor" in an initial screening procedure for disability determination and in other places. The conferees, however, use the term "severe" in its common sense meaning.

In order to be found disabled, a child must meet, medically equal or functionally equal a listed impairment. The ALJ found that the severe impairments in this case are ADHD and an adjustment disorder. In the opinion of the Court, the medical evidence in the record that was before the ALJ also establishes that Plaintiff has a fetal alcohol syndrome. Fetal alcohol syndrome is "a brain disorder of children impaired in utero by maternal alcohol consumption, some characteristics of which are 'inappropriate social behavior, memory deficits ... lack of judgment, lack of remorse for misbehavior, lying, ... unusual aggressiveness, and wide variations in learning abilities at different times.'" *Devereaux v. Perez,* 218 F.3d 1045, 1057 (9th Cir.2000) quoting Barbara A. Morse, Information Processing: Identifying the Behavior Disorders of Fetal Alcohol Syndrome, in Fantastic Antone Succeeds: Experiences in Educating Children with Fetal Alcohol Syndrome 26–27 (1993, Judith S. Kleinfeld and Siobhan Wescott, editors). Evidence which was made a part of the record after the ALJ's decision indicates that it is possible that a seizure disorder is also a severe impairment. Nevertheless, the Court will limit this review to a determination of whether Plaintiff's ADHD meets, medically equals or functionally equals listing 112.11 Attention Deficit Hyperactivity Disorder. This listing, in pertinent part, requires:

A. Medically documented findings of all three of the following:

1. Marked inattention; and

2. Marked impulsiveness; and

3. Marked hyperactivity;

AND

... for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

112.02 B2. For children (age 3 to attainment of age 18), resulting in at least two of the following:

a. Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

d. Deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner.

As evidence to support his finding that Plaintiff does not medically meet or equal the above cited listing, the ALJ relied on the opinion expressed, through the completion of Childhood Disability Evaluation Form, by two psychologists employed by Disability Determination Services. Neither of these psychologists treated or evaluated Plaintiff. Rather, the psychologists reviewed the medical and educational records provided to them. Plaintiff did not come forward with any medical evidence to refute those opinions and Plaintiff does not challenge the ALJ's finding that Plaintiff does not meet or medically equal the listed impairment. Rather, Plaintiff argues that the ALJ should have found that he functionally equals the impairment, and should, therefore, be found disabled.

20 C.F.R. § 416.926a, effective January 2, 2001, states in pertinent part:

Functional equivalence for children.

(a) General. If you have a severe impairment or combination of impairments that does not meet or medically equal any listing, we will decide whether it results in limitations that functionally equal the listings. By "functionally equal the listings," we mean that your impairment(s) must be of listing-level severity; i.e., it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain, as explained in this section.... When we make a finding regarding functional equivalence, we will assess the interactive and cumulative effects of all of the impairments for which we have evidence, including any impairments you have that are not "severe." (See § 416.924(c).)

\* \* \* \* \* \*

(1) We will consider how you function in your activities in terms of six domains. These domains are broad areas of functioning intended to capture all of what a child can or cannot do.

\* \* \* \* \* \*

The domains we use are:

(i) Acquiring and using information;

(ii) Attending and completing tasks;

(iii) Interacting and relating with others;

(iv) Moving about and manipulating objects;

(v) Caring for yourself; and,

(vi) Health and physical well-being.

In order to functionally meet a listed impairment, it must be found that two of the above domains are at the "marked" level of impairment, or that one of the domains is at the "extreme" level of impairment. The Regulation defines "marked" and "extreme" as:

(i) We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

\* \* \* \* \* \*

(i) We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Extreme" limitation also means a limitation that is "more than marked." "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the

functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

20 C.F.R. § 416.926a (e)(2) & (3).

■ In the case at bar, it is the opinion of the Court that substantial evidence on the record that was before the ALJ supports a finding that Plaintiff is limited to a marked degree, if not to an extreme degree in two of the six domains listed above—attending and completing tasks and interacting and relating with others.

Regarding the ability to attend and complete tasks, the written and oral testimony from Plaintiff's teachers and father provides substantial evidence that Plaintiff is not able to focus and maintain his attention. Plaintiff is unable to filter out distractions and remain focused on an activity at a consistent level of performance absent one on one supervision from an adult. Plaintiff repeatedly becomes sidetracked from his own activities and frequently interrupts others. *See* 20 C.F.R. § 416.926a (h)

Likewise, substantial evidence in this record supports a finding that Plaintiff has serious, if not very serious, problems interacting and relating with others. According to his teachers, Plaintiff is very quick to provoke fights and other incidents, such as sexual harassment, with other students and even the school staff. Plaintiff has demonstrated a marked or extreme inability to follow social rules for interaction and conversation and to respond appropriately and meaningfully at home, school and in other social situations such as at church. Plaintiff has demonstrated a marked or extreme inability to understand and tolerate others' points of view and differences. *See* 20 C.F.R. § 416.926a (i).

The ALJ was concerned that Plaintiff's medication is effective in controlling his behavior, and that it is only when the medication is not taken that Plaintiff is out of control. While there is some evidence to support that conclusion, when the record is read in its entirety it becomes clear that the medication is not effective on a consistent basis. Also, Dr. Huesgen wrote that while an increased dosage of medication may have stabilized some symptoms, Plaintiff became more irritable, depressed and withdrawn. Both Plaintiff's father and his teachers testified that even when Plaintiff takes his medication correctly, it is not consistently effective. The records submitted to the Appeals Council indicate that some of Plaintiff's behavior problems may be due to a seizure disorder. If that is true, perhaps different medication will be effective in controlling Plaintiff's problems. That situation can be addressed when the Commissioner initiates a periodic review of Plaintiff's eligibility to continue receiving benefits. In the meantime, the evidence in this record clearly supports only one finding, namely that Plaintiff functionally meets the listings of impairments and is entitled to the benefits for which he has applied.

## CONCLUSION

It is the holding of this Court that Commissioner's decision is not supported by substantial evidence on the record as a whole. The Court finds that the evidence in this record is transparently one sided against the Commissioner's decision. *See Bradley v. Bowen,* 660 F.Supp. 276, 279 (W.D.Ark.1987). Using the standards articulated in the congressional record cited above, it is the holding of this Court that Plaintiff's impairments are marked and severe "in [the] common sense meaning" of those words. Plaintiff has met that definition of disability from the date of his application. Substantial evidence on the record as a whole establishes that Plaintiff functionally equals a listed impairment and that he is entitled to the benefits for which he applied. A remand to take additional evidence would only delay the receipt of benefits to which Plaintiff is entitled.

Defendant's motion to affirm the Commissioner's final decision is denied. **This cause is remanded to the Commissioner for computation and payment of benefits.** The judgment to be entered will

 

trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See Shalala v. Schaefer,* 509 U.S. 292, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993). *See also, McDannel v. Apfel,* 78 F.Supp.2d 944 (S.D.Iowa 1999), and LR 54.2(b).

IT IS SO ORDERED.